# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**
       **Plaintiff,**

**v.**                    **Criminal Action No: 1:12CR29**

**SAMAD MADIR HARVEY,**
       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 24th day of September 2012, came the defendant, Samad Madir Harvey, in person and by L. Richard Walker, his attorney, and also came the United States by its Assistant United States Attorney, Zelda E. Wesley, for a hearing on Defendant's Motion to Suppress Physical Evidence Based on an Illegal Traffic Stop [DE 20] and Motion to Suppress [DE 21], which motions were filed on September 13, 2012. The United States filed a single Response to both Motions on September 21, 2012 [DE 30]. The matter was referred to the undersigned United States Magistrate Judge on September 14, 2012, by United States District Judge Irene M. Keeley [DE 22]. This Report and Recommendation addresses only the second Motion [DE 21]. The first Motion was addressed in the previously filed Report and Recommendation.

## I. Procedural History

On May 1, 2012, Defendant was Indicted by a Grand Jury seated in the Northern District of West Virginia at Clarksburg [DE1]. He was charged with One Count of possession of a firearm by a convicted felon. Defendant was arraigned on August 9, 2012. The motions before the Court were filed on September 13, 2012.

## II. Contentions

Defendant contends:

1.   The officer's entry into Defendant's residence was without warrant, consent or exigent circumstances, and therefore violated Defendant's Fourth Amendment rights.

2.   Any evidence seized as a result of the subsequent warrant is fruit of the poisonous tree, and should be suppressed.

Government contends: "[T]he United States will present testimony refuting defendants claims at the suppression hearing."[1]

### III.  Statement of Facts

The Court received the sworn testimony of three witnesses under oath, to wit:  City of Morgantown Police Officers Jason Ammons and Kenneth Murphey, and Defendant.  The Court also received exhibits.  From the evidence and testimony presented, the Court makes the following findings of fact:

Officer Murphey had stopped the car in which Defendant was a passenger, for a traffic violation.[2]  Officers Trump and Knight arrived at the scene as backup for Officer Murphey.  Officer Ammons was the last to arrive at the scene.  He was alone in his cruiser.  When he arrived Officer Trump signaled[3] to him that he smelled something in the car.   Officer Ammons watched the defendant, who was a  passenger in the back seat of the vehicle.   The smell of burnt marijuana resulted in the additional investigation and justifying a search of the vehicle The officers began

---

[1]United States' Response To Defendant's Motions To Suppress [DE 30] filed September 21, 2012 pursuant to LRCrP 47.01(a) and paragraph 5 of the Court's Initial Scheduling Order [DE 15].

[2]The facts regarding the traffic stop itself are discussed in the Report and Recommendation regarding Docket Entry 20.

[3]The signal was a non-verbal pointing of the index finger to the nose indicating the presence of the smell of a controlled substance such as marijuana.

removing everyone from the vehicle. Officer Ammons removed Defendant with the help of Sgt. Knight. Sgt. Knight took control of Defendant, or stood with him and the other passenger, while Officer Ammons[4] and Officer Murphey searched the vehicle. A water bong was found in the trunk of the vehicle. Sgt. Knight performed a pat down of Defendant for weapons.

After searching the vehicle Officer Ammons asked for Defendant's name and date of birth. Officer Ammons testified he recalled Defendant giving him the first name Samad, but could not recall the last name or date of birth he provided. Defendant testified he gave the officer his correct name and birth date. Officer Ammons called 911, but was informed there was "no return" for that name and date of birth. There is no dispute that Officer Ammons told Defendant there was no return on the name and date of birth he provided. Defendant testified he had told Officer Ammons his correct name, but then heard Officer Ammons give the last name "Hardin" on the phone instead of "Harvey." He told Officer Ammons, "It's Harvey, not Hardin." Officer Ammons then said, "Which one is it?" Defendant did not answer that his name was "Harvey," instead replying, "My ID is in my crib." Officer Ammons testified that Harvey did not have to provide any identification. Ammons then testified: "But if I ask for identification and he provides me false identification, now he is hindering me by lying to me." "We didn't have anybody's, nobody could identify anybody in the vehicle and then the uncle saying 'What name do you want me to tell them?' is what I'm thinking - ok there's something up here - criminal activity is afoot - why are we not getting people's information?" "When I ran it through the 911 center it did not return." At that point it was Ammons' opinion that Defendant had not committed a crime but that he had provided false information and was hindering

---

[4]Officer Amons first testified he searched the car. Later he impliedly retracted his earlier testimony by testifying that he did not participate in the search of the car.

the police.

It is undisputed that when Officer Ammons asked Defendant whether his name was Harvey or Hardin, Defendant replied, "My ID is in my crib." Officer Ammons testified: "He [Defendant] said he could retrieve it and- ah - of course I would have to escort him in to get that because I'm not letting anyone walk in a house to come back out, you know, with identification, so I escort them inside." When asked if during the escort Harvey was free to leave Ammons said: "At that point in time, no. We were still trying to figure out who he is now with having information." Defendant was still detained under a minor investigation. As Officer Ammons stated, "He couldn't walk off." Ammons testified the escort he conducted was not mandatory. He testified: "If he is going to go in the house to obtain an identification, then I'm going with him. If he doesn't go in the house to get it, then I'm not going with him." He could not recall whether he told Defendant he was going with him into the house. In fact, Ammon's did not testify he made either statement of opinion to or in the presence of Harvey. He merely testified to his opinions at the suppression hearing. However, he testified that he did not ask Defendant if he could go into the house with him; that Defendant never told him he could go into the house; and "but he never told me I couldn't."

Harvey testified that Ammons said: "I'm going to escort you inside your house and you're gonna give me your ID . . . I just left it like that - I didn't question him or nothin' like that, I just did what he told me to do." He testified Ammons went in first, ahead of him. Another officer followed, but stayed at the door and did not go inside the house.

The undisputed evidence is that Defendant was not handcuffed and the officer did not have his firearm drawn ans he entered the house. Defendant was not arrested at the time. He was, however, detained and could not leave. Officer Ammons walked with Defendant into the house.

They walked up into the yard, up about 6-8 stairs and then into a front door. It is also undisputed that Defendant " never once stopped and said: you can't come in or anything like that."

From the front door one could see into a kitchen area and the living room. Officer Ammons testified he believed:

> Officer Trump had already entered with his subject because his subject also wouldn't give a valid identification. They were actually I believe sitting on like a little futon couch in that area. There had been an uncle or relative in the house, but during the traffic stop, when the driver asked for his uncle to get his identification --I was actually standing up by the door - the uncle shut the door and I could hear him say on the phone, "What name do you want me to give them?" When I turned to look at the driver, the driver had that deer in the headlights look and he immediately stopped talking. So, I don't recall if we had the uncle come out at that time but he never returned with any identifications for us.[5]

Past the living room to the kitchen was a hallway to the left that went in to the back left bedroom. Defendant walked into the bedroom in front of Officer Ammons. Officer Ammons testified he understood the room to be Defendant's bedroom "because he walked in there on his own to get the identification he told me was in the house."

Officer Ammons then testified:

> When he [Defendant] walked in the bedroom, he actually pulled a drawer out ... He tried to shield what he was doing with his body ... as he pulled the drawer out, he reached down to his pocket ... at that point in time, I went ahead and released the lock on my firearm and stepped up on top of Mr. Harvey, I don't know what's in that drawer and I've got family. So as I stepped up on top of him I noticed him throwing identification down in to the drawer and he starts fumbling with some papers with his right hand as I'm watching him as he - the identification never actually gets out of sight - He pulls the identification back out and as he goes to turn around – as I step back there is a rice-a-roni box on the table right beside where that drawer was in plain view and it was open and I could see a plastic bag sticking out with what I thought to be the packaging of heroin which I have probably seen in excess of 50 bricks of heroin...."

---

[5]This person was the driver of the Jaguar, not Defendant Harvey. The statement of the driver's uncle apparently did not pertain to Defendant Harvey.

Defendant then handed Officer Ammons his identification. Officer Ammons ran the ID. The result was that there were two outstanding warrants on Defendant.

Officer Ammons testified he could smell green or raw marijuana and that triggered his need to clear and secure the residence and seek a search warrant for the house. He contacted the drug task force to obtain one[6].

## IV. DISCUSSION

### A. The Request for Identification

As already stated, this decision addresses only entry into the residence after the traffic stop. The undersigned has already recommended to the District Judge that she find the traffic stop itself was legal.

In <u>Soriano-Jarquin</u>, 492 F.3d 495 (4th Cir. 2007), the Fourth Circuit stated:

> We believe a simple request for identification from passengers falls within the purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event. Assuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene. Just as the officer may ask for the identification of the driver of a lawfully stopped vehicle, *see, e.g.*, *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.E.2nd 660 (1979), so he may request identification of the passengers also lawfully stopped. No separate showing is required.

> The Supreme Court has long held that ensuring officer's personal safety is of critical importance in the conduct of traffic stops. It is well established that officers performing a lawful stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety" thereafter. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

---

[6]Officer Ammons explained that as a police officer from Morgantown now involved in a potential search and investigation in Star City, he had to use the Star City police, State Police, Monongalia Sheriff's deputy, or the drug task force to seek the search warrant because he was out of his jurisdiction, but those entities would have jurisdiction. He elected to use the drug task force to seek the search warrant.

Officer Ammons therefore did not violate Defendant's rights by requesting his name and date of birth. More importantly, Officer Ammons testified that when he arrived on the scene, Officer Trump was at the front passenger side window of the vehicle, and indicated to Officer Ammons by making a motion, that he smelled marijuana in the vehicle. This claim was not disputed by Defendant. It was at this point that Defendant was removed from the vehicle. Whether smelling the odor of marijuana in a motor vehicle would result in a reasonable suspicion of a serious crime has been directly addressed by the Fourth Circuit in U.S. v. Sheetz, 293 F.3d 175 (4th Cir. 2002), as follows:

> Once the car was properly stopped and the narcotics officers smelled marijuana, the narcotics officers properly conducted a search of the car. United States v. Morin, 949 F.2d 297 (10th Cir. 1991)(holding that, because marijuana has a distinct smell, "the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage").

Considering all of the above, the officers in this case were permitted to request the driver's and passengers' licenses, remove them all from the vehicle, pat them down, and conduct a search of the vehicle.

### B. Entry into the Home

The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

It is undisputed that the entry into and initial entry into and search of Defendant's residence was without a warrant. The United States Supreme Court holds:

> It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." _Groh v. Ramirez_, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L.Ed.2d 1068 (2004)(_quoting Payton v. New York_, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L.Ed.2d 639(1980) (some internal quotation marks omitted)). Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. _Flippo v. West Virginia_, 528 U.S. 11, 13, 120 S. Ct. 7, 145 L.Ed.2d 16 (1999) (per curiam); _Katz v. United States_, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed. 2d 576 (1967). We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause. _Michigan v. Tyler_, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), to prevent the imminent destruction of evidence, _Ker v. California_, 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), or to engage in "hot pursuit" of a fleeing suspect, _United States v. Santana_, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." _Mincy v. Arizona_, 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Brigham City, Utah v. Stuart, 547 U.S. 398, 126 S. Ct. 1943 (2006).

The Government did not expressly argue any exception to the warrant requirement. The Government's Response to both of Defendant's Motions was, in _toto_:

> Now comes the United States of America by William J. Ihlenfeld, II, United States Attorney for the Northern District of West Virginia, by Zelda E. Wesley, Assistant United States Attorney, and advises the court the United States will present testimony refuting defendant's claims at the suppression hearing.

[Docket Entry 30]. The court heard the following testimony from Officer Ammons regarding his entry into Defendant's residence:

1. Pursuant to the traffic stop and smell of marijuana in the vehicle, the Defendant, a passenger in the vehicle, was being detained and could not leave.

2. Ammons was permitted under those circumstances to ask for Defendant's identification.

3.   Defendant "doesn't really have to provide any identification," but

4.   "If he provides me false identification, now he is hindering me by lying to me."

5.   Defendant gave him a name he did not recall at the hearing, and it came back as no return.

6.   Officer Ammons could not recall what he did after the 911 call came back no return.

7.   Officer Ammons testified he "most likely" told Defendant something like, "I got no hit on your information," or "Hey, your info doesn't return."

8.   Officer Ammons testified that Defendant had not committed a crime at that point, but had provided false information to him and was hindering the police.

9.   Defendant said, "My ID is in my house."

10.  Escort of Defendant into his house was not mandatory, but

11.  "Of course I would have to escort him in to get that because I'm not letting anyone walk in a house to come back out with identification – so I escorted him inside" and "If he's going into the house, I'm going with him."

12.  Officer Ammons did not ask if he could go into the house.

13.  Defendant did not tell Officer Ammons he could go into his house.

14.  Defendant never told Officer Ammons he could not go into his house.

15.  Defendant never expressed, one way or another, whether Officer Ammons could go into the house.

From all the testimony and evidence, the sole argument the undersigned finds may have been made by the Government was that Defendant consented to the entry of his house. The undersigned does not find any "exigent circumstances" in fact existed or were even argued by the Government to exist justifying the officer's warrantless entry into Defendant's residence. However, the undersigned

will address that issue in an overabundance of caution.

## 1. Exigent Circumstances

Officer Ammons testified Defendant did not even have to provide identification and that "escort" by an officer into the residence was "not mandatory." In the recent case of _Kentucky v. King_, 131 S.Ct. 1849 (2011) the Supreme Court noted three broad categories of "exigent circumstances" serving as exceptions to the warrant requirement of the Fourth Amendment, to wit: (1) the emergency aid exception; the hot pursuit exception; and the prevention of imminent destruction of evidence exception. In _Brigham City, Utah v. Stuart_, 547 U.S. 398, 126 S.Ct.1943, 164 L.Ed.2d 650 (2006), cited in _Kentucky v. King_, _Id._ the United States Supreme Court stated as follows:

> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. " _Id._ at 392, 98 S.Ct. 2408 (quoting _Wayne v. United States_, 318 F.2d 205, 212 (C.A.D.C.1963) (Burger, J.)); see also _Tyler, supra,_ at 509, 98 S.Ct. 1942. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. _Mincey, supra,_ at 392, 98 S.Ct. 2408; see also _Georgia v. Randolph,_ 547 U.S. 103, ----, 126 S.Ct. 1515, 1525, 164 L.Ed.2d 208 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur") . . . .

> . . . . An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed _objectively,_ justify [the] action." _Scott v. United States,_ 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (emphasis added). The officer's subjective motivation is irrelevant. See _Bond v. United States,_ 529 U.S. 334, 338, n. 2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

In another case, Welsh v. Wisconsin, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d,the 732 (1984), the Supreme Court held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." Welsh

involved a warrantless entry by officers to arrest a suspect for driving while intoxicated. There, the Supreme Court found the "only potential emergency" confronting the officers was the need to preserve evidence ( *i.e.,* the suspect's blood-alcohol level), which the Supreme Court held was an insufficient reason for a warrantless entry into the home.

Again, even though not argued by the United States, the undersigned considered and found no facts which supported any of the other Fourth Circuit recognized types of exigent circumstance exceptions to the warrant requirement of the Fourth Amendment. There was no evidence offered from which the undersigned could conclude that Officer Ammons entered the residence and room of Defendant because he had formed a reasonable belief that contraband or other evidence may be destroyed or removed before a search warrant could be obtained. *Mincey v. Arizona*, 437 U.S. 385, 392-394 (1978); *United States v. Taylor*, 90 F.3d 903, 907 (4th Cir. 1996); *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981); *United States v. Grissett*, 825 F.2d 776, 778 (4th Cir. 1991); *United States v. Moss*, 963 F.2d 673, 679-680 (4th Cir. 1992); and *United States v. Reid*, 929 F.2d 990, 993-994 (4th Cir. 1991). Nor was any evidence offered which establishes that any of the officers were considering getting a warrant for a search of the residence prior to Ammon's entry and wanted warrantless entry and control of the property while such a warrant was sought. *United States v. Cephas*, 254 F.3d 488, 494-495 (4th Cir. 2001). Nor was any evidence offered of hot pursuit, emergency aid, or even officer safety. With respect to the latter, Officer Ammons did not say his reason for having a preconceived notion and plan to follow Defendant in to the residence and private bedroom was for officer safety. He did not release his firearm until he observed Defendant rummaging around in the opened drawer in the bedroom. His statement that he had a family was made relative to that action, not with respect to the decision he made outside near the car to go in the

house if Defendant did.   Nor is there anything in the record to support a conclusion by the undersigned that this was a protective sweep search by officers incident to the arrest of persons in or immediately outside of the residence in question in order to protect the safety of the arresting and responding officers.   There was no evidence to support what Justice White described as a reasonable belief based on specific and articulable facts held by the searching officer that area to be swept harbors individual posing danger to those on arrest scene. *Maryland vy Buie*, 494 U.S. 325, 334 (1990).

In the case at bar, Defendant was not under arrest and was not believed to have committed any crime.   No one was injured or needed assistance in the residence.   There was no arrestable "underlying offense" in this case as regards Defendant.   The driver of the car was driving without a license and the officers smelled burnt marijuana in the car.   The officers found a bong in the trunk. Defendant was a passenger in the car.    There was no evidence Defendant had committed any crime. He was not connected to the bong or the marijuana smell. The police did not find any marijuana in the car and did not test the bong for residue or fingerprints. Whether Defendant provided a false name or Officer Ammons heard the name incorrectly, Defendant's offer that his ID was in his "crib" was an insufficient reason for a warrantless entry into his home.

Accordingly, the undersigned concludes on the totality of the facts of this case that the United States has failed to carry its burden of proving that exigent circumstances existed or that an emergency existed  which justified the warrantless police entry into Defendant's home on the date in question.

## 2.  Consent

Although not expressly argued, the United States appears to contend that Defendant consented

to Officer Ammons entering his residence. A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973). Whether consent to search was given is a factual issue to be determined by this Court in light of all the circumstances. <u>United States v. Mendenhall</u>, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980)*. <u>United States v. Vickers</u>, 387 F.2d 703 (4th Cir. 1967) <u>citing</u> <u>Channel v. United States</u>, 285 F.2d 217 (4th Cir. 1960), <u>United States v. Rusher</u>, 966 F.2d 868 (4th Cir. 1992). That factual determination will not be disturbed unless it is clearly erroneous. <u>United States v. Gordon</u>, 895 F.2d 923, 938 (4th Cir). The government bears the burden of proving consent was given for the search. <u>United States v. Vickers</u>, <u>supra</u>, <u>citing</u> <u>Wren v. United States</u>, 352 F.2d 617 (10th Cir. 1965).

The Court must determine any challenge to consent, based upon the "totality of the circumstances." Where appropriate, the Court must also determine whether consent was knowing and voluntary. The burden is on the Government to prove consent by a preponderance of the evidence. <u>See</u>, <u>e.g.</u>, <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980), <u>United States v. Boone</u>, 245 F.3d 352 (4th Cir. 2001); <u>United States v. Brugal</u>, 209 F.3d 353 (4th Cir. 2000); <u>United States v. Elie</u>, 111 F.3d 1135 (4th Cir. 1997); and <u>United States v. Lattimore</u>, 87 F.3d 647 (4th Cir. 1996).

The factors to be considered in determining whether . . . consent to search was freely and voluntarily given" are outlined in <u>Elie</u>, <u>supra</u>:

> [I]t is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter.

111F.3d at 1144.

"*Written* consent supports a finding that consent was voluntary." Boone, 245 F.3d at 662 (emphasis added), citing United States v. Navarro, 90 F.3d 1245 (7th Cir. 1996). There was, of course, no written consent in this case.

Notwithstanding that consent must be knowing and voluntary, the Government does not have a burden to show that an individual was told or otherwise knew he had the right to refuse consent. See, e.g., Ohio v. Robinette, 519 U.S. 33. Not even "the drawing of a gun by an arresting officer" or "the handcuffing of the accused establishes involuntariness in and of itself." Elie, supra at 1145-1146; however, consent must be more than mere acquiescence to apparently lawful authority. See Bumper v. North Carolina, 391 U.S. 543 (1968)(no consent to search if only acquiescence to apparently lawful authority); Lattimore, 87 F.3d at 652 (but for defendant's prior consent to search, state trooper's unfounded threat to call a drug dog . . . raise[s] serious questions concerning the voluntariness of his consent"); but see United States v. Smith, 30 F.3d 568 (4th Cir. 1994) (unlocking car door and appearing cooperative with police sufficient evidence of consent, rejecting defendant's argument that cooperation was motivated by fear of police).

In this case the issue is simply: "Was consent given, and if so, was it freely and voluntary given?" It is undisputed that there was no written consent. It is also undisputed that there was no express consent. The United States could not contend otherwise because the testimony clearly shows that Defendant did not expressly consent. As Officer Ammons testified, he did not ask for Defendant's consent to enter his home, and Defendant never expressed "one way or the other" whether the officer could enter his home. By process of elimination and even though the United States does not specifically argue it in response to the motion, the undersigned concludes it must be relying on an "implied consent" to enter the home.

The United States has the burden of proof by a preponderance of the evidence since any warrantless search of a person's home is "presumptively unreasonable." Groh v. Ramirez, supra, United States v. Vickers, 387 F.2d 703 (4th Cir. 1967). The United States appears to argue that Defendant's statement "My ID's in my crib," along with his "allowing" the officers to go with him up the stairs and into his house without protest indicates consent for them to do so.

On occasion, non-verbal consent to searches has been sustained. In U.S. v. Smith, 30 F.3d 568 (4th Cir. 1994), the police asked a suspect whether they could search his car. The suspect made no verbal response, but approached the car and unlocked it. The police searched the car and found cocaine. The Fourth Circuit held that the suspect's act of unlocking his car door in response to the request by police to search it constituted an implied consent to search. In U.S. v. Wilson, 895 F.2d 168 (4th Cir. 1990), the court held that the defendant consented to a search of his person by shrugging his shoulders and extending his arms in response to an agent's request to search him. In U.S. v. Stewart, 93 F.3d 189 (5th Cir. 1996), the Fifth Circuit explained the rather universal truth that "magic words" (such as "yes") are not necessary to evince consent because the "key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect." In U.S. v. Griffin, 530 F2d 739 (7th Cir. 1976), the Seventh Circuit underscored the concept that "consent may be in the form of words, gesture, or conduct." In Robbins v. MacKenzie, 364 F.2d 45 (1st Cir. 1966), the First Circuit held that there was consent where the defendant, after an officer knocked on the door, identified himself as a police officer, and said he wished to talk to the defendant, responded "just a minute," unlocked the door, opened it and then walked back into the room.

By contrast, in Karwicki v. United States, 55 F.2d 225 (4th Cir. 1932), the Fourth Circuit reversed the defendant's conviction for possession of whiskey. The police encountered Defendant in

a saloon. He lived in rooms connected to the saloon. The police told the defendant they had a complaint that whiskey was being sold there, which the defendant denied. An officer then stated, "Well, if there is no whiskey or beer here, you have no objection to our looking around." The defendant did not say anything in response. The officers searched the saloon, finding nothing, and then his connecting rooms, where they found whiskey. The Fourth Circuit held that the search had violated the defendant's Fourth Amendment rights, commenting,

> [W]hen officers search without [a] warrant upon consent given by the owner of the property, the consent must be unequivocal and specific, particularly when the premises searched may reasonably be held not to have been covered by the consent given. The fact that [the defendant] did not protest against the search of his living quarters is without significance. He was not required to protest.

Granted, Karwicki is an old case, but it has not been reversed or even questioned in this Circuit. The decisions, both finding and not finding consent, teach that, in examining the totality of the circumstances to determine whether a reasonable officer would interpret conduct as consent, it is necessary to consider the question posed by, and the actions of, law enforcement officers to which the defendant's non-verbal conduct was a response. See U.S. v. Bynum, 125 F.Supp.2d 772 (E.D. Va. 2000).

In U.S. v. Shaibu, 920 F.2d 1423 (9th Cir. 1990), the defendant walked out of an apartment into a hallway, the officer identified himself and asked whether a third party was in the apartment, and the defendant walked back into the apartment leaving the door open as the officers followed him inside. The Ninth Circuit distinguished those facts from the facts in the Seventh Circuit case, Griffin, supra, because in Griffin the police had requested entry into the apartment, to which the defendant's conduct in stepping into the apartment and leaving the door open was a non-verbal affirmative

response, whereas, in <u>Shaibu</u>, the defendant's actions were in response, not to a request for entry, but to a request to identify someone. Thus, they could not be reasonably construed to affirmatively evidence consent to search. Similarly, in <u>U.S. v. Gwinn</u>, 46 F.Supp.2d 479 (S.D.W.Va. 1999), the district court found dispositive the substance of the law enforcement officer's query in measuring the effect of the defendant's responsive gesture. In <u>Gwinn</u>, an occupant did not object to a search of the room in which she was sitting and, at an officer's request, moved from the couch so the officer could retrieve a gun from beneath it. The district court explained:

> The Fourth Circuit cases finding implied consent fall into three general categories: cases in which there was a specific request by police officers and a nonverbal affirmative response by an individual, cases in which an individual took some affirmative act that directly exposed his or her property to inspection, and a case in which there was a working relationship between police officers and a cooperating individual.

The Court of Special Appeals of Maryland, following Fourth Circuit case law, held in a case very similar to the case at bar, that police violated a defendant's Fourth Amendment rights by following him to his apartment. <u>See</u> <u>Turner v. State of Maryland</u>, 754 A.2d 1074 (Md. 2000). In <u>Turner</u>, a police officer observed a "faded and dirty" vehicle with "fairly new" license tags. Thinking that suspicious, the officer called the tags in over the police radio and learned they were not registered to that vehicle. He attempted to make a traffic stop, but the driver sped off and a chase ensued. The officer eventually forced the vehicle to a stop, at which time the driver "bailed out" of the car and fled.

The officer stayed with the vehicle while other officers pursued the driver. He ran an MVA check, which revealed the car was registered to the defendant and that the defendant lived in a nearby apartment complex. He relayed that information to another officer, who went to the defendant's

apartment and knocked on the door. The defendant responded and opened the door, stepping out of the apartment and onto the landing, pulling the door shut behind him. The officer asked the defendant for identification and asked if he knew where his car was. The defendant responded that he did not know where his identification or his car were. The defendant then accompanied the officer down to the first floor of the building so that the original officer could try to identify him as the driver. (It later was revealed that he was not). The officer once again raised the issue of identification. Both officers asked the defendant whether he had something in his apartment which would confirm his identity. The defendant responded that he had a telephone bill in his apartment that he could show them. He then walked back up the steps to the third floor with the two officers close behind him.

The defendant opened his door and entered. The two officers followed. Nothing was said. The officers did not ask permission to enter or tell the defendant they were about to enter and the defendant did not tell them not to enter. One officer testified that because he was responding to a call for "fleeing and eluding a police officer," he would not have let the defendant out of his sight; however, if the defendant had told him not to enter, he would have complied. He testified that the defendant did not say or do anything to indicate he objected to their presence. The officers saw a gun in plain view as well as crack cocaine. They arrested the defendant and later obtained a search warrant for the rest of his apartment.

Upon Motion to Suppress, the trial court found as follows:

While waiting on the first floor, the [officers] had additional conversation as to whether or not [defendant] could produce any type of identification. It was at that point that [defendant] mentioned that he thought he had a telephone bill with his name on it upstairs in his third floor apartment.

[Defendant] then proceeded to go back up to his apartment with Officer Price following behind him. [Defendant] obviously knew that Officer Price was behind him

18

as they climbed three flights of steps. Once they got to the apartment, [Defendant] opened the door to his apartment and entered. At no time, as they were climbing steps or when they reached the door to the apartment did [Defendant] ever tell Officer Price not to come on back up to the apartment or not to come into the apartment or make any objection whatsoever. There was no evidence that that occurred.

So, I find that the consent, it was a consent search . . . at no time did [Defendant] object to the officer entering the apartment when he certainly had an opportunity to do so as they climbed the stairs to the apartment. So, I find that there was no violation of [Defendant's] Fourth Amendment rights . . . .

On Appeal, the Court of Special Appeals of Maryland first noted:

To be sure, the Maryland and Fourth Circuit cases plainly establish that consent to search not only may be express, by words, but also may be implied, by conduct or gesture . . . . Yet, in all of these cases, the police made it known, either expressly or impliedly, that they wished to enter the defendant's house, or to conduct a search, and within that context, the conduct from which consent was inferred gained meaning as an unambiguous gesture of invitation or cooperation or as an affirmative act to make the premises accessible for entry. By contrast, in those Fourth Circuit cases in which the court concluded that the facts could not support a finding of implied consent, the law enforcement officers either did not ask for permission to enter or search, and thus did not make known their objective, or, if they did, their request was met with no response or one that was nonspecific and ambiguous.

The court then quoted <u>Shaibu</u>, <u>supra</u>, as follows:

It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police walking in to a person's home without stopping at the door to ask permission.

We do not expect others to walk into our homes, even if the door is open, without first requesting permission to enter. That the police would so enter, without request, created an impression of authority to do so . . . We interpret failure to object to the police officer's thrusting himself into Shaibu's apartment as more likely suggesting submission to authority than implied or voluntary consent. Even if there was not implicit coercion in fact here, the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry . . . We must not shift the burden of proof from the government - - to show "unequivocal and specific" consent – to the Defendant, who would have to prove unequivocal and specific objection to a police entry, or be found

19

to have given implied consent.

> We hold that in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent.

Shaibu, supra, 920 F.2d at 1427. See also U.S. v. Gonzalez, 71 F.3d 819 (11th Cir. 1996)(homeowner's failure to bar "follow-on" entry of police into her residence did not constitute implied consent to enter).

In State v DeCoteau, 592 N.W.2d 579 (N.D. 1999), police officers went to the defendant's house to investigate an anonymous report of domestic disturbance. When they arrived, the defendant and his girlfriend were outside. Neither knew why the police were there. When the officers noticed a broken window, they told the girlfriend the sound of breaking glass had been reported and they wanted to see whether the children in the house were all right. The girlfriend entered the house and the police followed her, seeing a marijuana pipe in plain view. They subsequently obtained a search warrant. The court held that the girlfriend's conduct did not amount to consent to enter, reasoning that a finding of implied consent required proof that the person who supposedly gave consent engaged in "affirmative conduct" consistent with the giving of consent, not merely that the person did nothing to stop the police from entering. Id. at 583 (citing U.S. v. Jaras, 86 F.3d at 390; Shaibu, supra, U.S. v. Wenzel, 485 F.Supp. 481(D.Minn.1980)(failure to order uninvited officer to leave apartment is not enough to establish consent); Robinson v. State, 578 P.2d 141(Alaska 1978)(failure to demand that officers leave was not voluntary consent to their entry)).

Another strikingly similar case to the case at bar is State v Johnson, 177 Wis.2d 224, 501 N.W.2d 876 (1993). In that case, officers patrolling an apartment building in a high crime area stopped and frisked the defendant and, finding no drugs or weapons, asked him to produce

identification.  He told them it was in his girlfriend's apartment in the building.  One of the officers then accompanied the defendant to the apartment.  When the defendant went inside, the officer followed him.  The officer "did not ask for Johnson's permission to enter, and Johnson did not ask him to come in."  The court held that consent "cannot be found by a showing of mere acquiescence." Id. at 880 (quoting Shaibu, supra, 920 F.2d at 1426-27).

In Turner, the original Maryland case here cited, the court first noted that the police had asked the defendant to produce an item that would help establish his identity, and in order to obtain it, he had to enter his apartment.  The defendant could not have prevented the officers from following him up to his apartment door, and he was not required to close the door in their faces or turn around and order them to stay in the hallway.  In the words of the Ninth Circuit, to do so "would be to justify entry by consent and consent by entry," and would effectively relieve the government of the burden of proving consent.  Shaibu, supra, 920 F.2d at 1427.  The fact that the defendant did not direct the officers to leave his apartment once they were inside did not make the illegal entry legal.  The manner in which the police entered the apartment - - without asking permission and following close on the defendant's heels - - "must have telegraphed to him that they were entitled to be there."  The defendant's conduct did not amount to an implicit consent to the police to enter his apartment.

After reviewing the totality of the evidence presented during the hearing, the demeanor of the witnesses on the witness stand, their apparent biases and interests or lack of interest in the outcome of the pending litigation, their opportunity to know the facts to which they testified, and their consistency and inconsistencies, the undersigned concludes that the government has not shown, by a preponderance of the evidence, that Defendant voluntarily consented to the police entering his residence.  It is clear that Defendant was being detained and could not leave.  It was clear that if

Defendant went into his house to prove his identity, Officer Ammons held a preconceived view that he would "escort" him into the house even though he did not express that to Defendant at any time before entry. In short, there is no proof before the undersigned that Officer Ammons said anything to Defendant that Defendant or the undersigned could construe as a request by Ammons for permission to enter Defendant's room, must less the residence. In the absence of the question, nothing Defendant did as described in the evidence could be construed as giving the officer implied consent to enter. At best, Defendant's actions were

mere acquiescence to apparently lawful authority. See Bumper v. North Carolina, 391 U.S. 543 (1968)(no consent to search if only acquiescence to apparently lawful authority).

Accordingly, the undersigned finds and concludes that the United States has not met its burden of proving by a preponderance of the evidence that Defendant voluntarily consented to Officer Ammons entering his residence. A search prosecuted in violation of the Constitution is not made lawful by what it brings to light. Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. Therefore, the fact that Officer Ammons smelled the odor of green marijuana and saw what appeared to be heroin is not justification for an otherwise unconstitutional search.

### C. The Search Warrant

Subsequent to his entry in to the Defendant's residence and his smelling of green marijuana and his observation of what he believed to be heroin in Defendant's private bedroom, Officer Ammons called on the drug task force to assist him in obtaining a warrant to search the residence. Det. D.W. Helms submitted an affidavit to the Monongalia County Magistrate, Hershel R. Mullens in support of the Complaint for Search Warrant. The probable cause affidavit of D.W.Helms states:

On 12-16-2010 Ptlm. Murphey, of the Morgantown Police Dept., attempted to conduct a traffic stop on a Silver Jaguar for improper registration on University Ave. The vehicle continued to travel into Star City to [BLANKED OUT] Avenue, where the traffic stop was completed. During the stop, Samad Harvey and PFC Ammons entered the residence to look for Harvey's identification. PFC Ammons observed Harvey take his id from his personal possession and put into a drawer in a bedroom. Harvey then produced the id and handed it to PFC Ammons. While standing in the room, PFC Ammons detected a strong odor of green marijuana coming from the area where Harvey was standing. In plain view PFC Ammons then noticed a plastic bag sticking out of a Rice a Roni box. In the bag was purple colored wrappers which appeared to be packaging for heroin. The house was then secured by officers. Later another arrestee, Reashaun Billingsly was escorted into the house to look for his id. PFC Ammons secured the bedroom and did not allow Billingsly to enter that room. This investigation started on 12-16-2010 and continued to 12-17-2010.

Once the information gained from the non-consensual search of the residence is excluded from the affidavit, the state magistrate would have been left with and the undersigned, in behalf of this Court on review for probable cause, is left with the following:

On 12-16-2010 Ptlm. Murphey, of the Morgantown Police Dept., attempted to conduct a traffic stop on a Silver Jaguar for improper registration on University Ave. The vehicle continued to travel into Star City to [BLANKED OUT] Avenue, where the traffic stop was completed. During the stop, Samad Harvey and PFC Ammons entered the residence to look for Harvey's identification. .... The house was then secured by officers. Later another arrestee, Reashaun Billingsly was escorted into the house to look for his id. PFC Ammons secured the bedroom and did not allow Billingsly to enter that room. This investigation started on 12-16-2010 and continued to 12-17-2010.

Without more, this redacted averment and the search warrant which would have been based on it lacks probable cause for the search of Defendant's room during which the discovery of the gun which is the subject of the indictment against defendant was found. Accordingly, that contraband and only that contraband, including but not limited to the firearm, which was seized pursuant to the search of Defendant's room incident to the state magistrate's search warrant should be suppressed.

### V.  Recommendation

For the reasons herein stated, the undersigned accordingly recommends Defendant's Motion to Suppress [Docket Entry 21] be **GRANTED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation  to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United  States District Judge.  Failure to timely file objections to the Proposed Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Opinion, Report and Recommendation to counsel of record.

Respectfully submitted this 28th day of September, 2012.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE